**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

FREDERICK K. PASOUR,                          :
                                              :         CIVIL ACTION
          Plaintiff,                         :
                                              :
    v.                                      :
                                              :         NO.  13-2258
PHILADELPHIA HOUSING AUTHORITY,               :
                                              :
          Defendant.                         :


**MEMORANDUM**

BUCKWALTER, S.J.                                              December 17, 2014

     Currently pending before the Court is Defendant Philadelphia Housing Authority

("Defendant")'s Motion for Summary Judgment as to the sole remaining claim asserted by

Plaintiff Frederick K. Pasour ("Plaintiff").  For the following reasons, Defendant's Motion for

Summary Judgment is denied.

## I.  FACTUAL HISTORY[1]

     Plaintiff was hired by Defendant as labor counsel in June 2003.  (Am. Compl. ¶ 15.)

Defendant terminated Plaintiff's employment on May 27, 2011, at which time he was General

Counsel for Labor and Employment.  (Def.'s Mem. Supp. Mot. Summ. J. 1; Ex. B, Deposition of

---

[1] The statement of facts is compiled from a review of the parties' briefs and the evidence
submitted in conjunction with those briefs.  To the extent the parties allege a fact that is
unsupported by evidence, the Court does not include it in the recitation of facts.  Where the
parties have specifically cited exhibits, or portions of deposition testimony, attached to their
briefs, the Court has reviewed and considered those cited materials.  See Doeblers' Pa. Hybrids,
Inc. v. Doebler, 442 F.3d 812, 820 (3d Cir. 2006) ("As noted by the Seventh Circuit, 'Judges are
not like pigs, hunting for truffles buried in' the record.") (quoting Albrechtsen v. Bd. of Regents
of Univ. of Wis. Sys., 309 F.3d 433, 436 (7th Cir. 2002) (internal quotation omitted)); see also
Perkins v. City of Elizabeth, 412 F. App'x 554, 555 (3d Cir. 2011) (noting that "a court is not
obliged to scour the record to find evidence that will support a party's claims.") (citing
Doeblers', 442 F.3d at 820 n.8).

Frederick K. Pasour ("Pasour Dep."), 10:22–11:5, May 15, 2014.)  Plaintiff had previously held the positions of Director of Labor and Employment and Acting General Counsel for Labor and Employment.  (Id. at 11:14–12:2; Am. Compl. ¶¶ 13, 19–20.)  At various points throughout his employment with Defendant, Plaintiff's duties included the supervision of labor and employment matters handled by outside counsel, supervision of the Equal Employment Opportunity office, supervision of the worker's compensation program, provision of advice to his supervisors regarding labor and employment matters, and direct responsibility for enforcement of Defendant's sexual harassment policy.  (Am. Compl. ¶¶ 17, 19–20, 23.)  Plaintiff testified at his deposition that while he was never formally given the title of Head of Human Resources, he acted in that capacity and oversaw all human resource issues, aside from payroll and recruitment. (Pasour Dep. 134:19–135:20.)

When Plaintiff was hired, Carl Greene ("Greene") was Defendant's Executive Director. (Am. Compl. ¶ 16.)  In August 2010, a series of allegations regarding Greene were reported in newspapers and on television and radio broadcasts, including allegations that some of Defendant's former employees made sexual harassment claims against Greene, three of which were settled.  (Id. ¶¶ 27, 28.)  John F. Street ("Street"), at that time the Chairman of Defendant's Board of Commissioners, conducted an investigation of those allegations which eventually led to the Board terminating Greene's employment as Executive Director on September 23, 2010. (Def.'s Mem. Supp. Mot. Summ. J. 3.)  In connection with the investigation, Street prepared an investigative report dated September 23, 2010 ("Street Report").  (Am. Compl. ¶ 32.)  Michael F. Kelly ("Kelly"), Defendant's Interim Executive Director, was provided with a copy of the Street Report via email[2] three days before he appointed an acting director of human resources, who

_____

[2] Kelly testified at his deposition that, while he generally recalled seeing the Street Report, he never read it or had discussions with anyone about it.  (Def.'s Mem. Supp. Mot. Summ. J. 22,

would be Plaintiff's supervisor.  (Pl.'s Resp. Opp'n Summ. J. 6, Ex. 11, Email to Michael Kelly

from Leigh Poltrock, Jan. 25, 2011; Pasour Dep. 26:7–29, Ex. 4.)  One of Defendant's former

employees "vaguely" recalled hearing from Street that he believed Plaintiff was responsible for

not reporting matters concerning Greene to the Board.  (Pl.'s Resp. Opp'n Mot. Summ. J. 4; Ex.

5, Deposition of Kafi Lindsay, Esq. ("Lindsay Dep."), 37:9:38–5, June 13, 2014.)  Street made

the Street Report available to the press and it appeared in the media as a result.  (Am. Compl. ¶

34; Lindsay Dep. 36:14–24.)  The Street Report stated that Plaintiff failed in his duty to

Defendant and named Plaintiff as one of three individuals who engaged in a "deliberate

conspiracy" to keep knowledge of the Greene settlements from the Board of Commissioners.

(Pl.'s Resp. Opp'n Mot. Summ. J. Ex. 8, Street Report 3–7.)  The Street Report also included the

following statement: "Mr. Pasour engaged in a conspiracy to cover up the sexual harassment

charges and settlements under duress knowing full well that failure to comply with Mr. Greene's

directives would result in [his] immediate dismissal."  (Id. at 11.)  Street announced that

---

Ex. C, Deposition of Michael Kelly ("Kelly Dep."), 59:9–13, 62:18–20, 65:10–12, 202:25–
203:1, May 22, 2014.)  Specifically, when asked by his attorney whether he had "**ever actually
read that report**" Mr. Kelly answered "**No.**"  (Id. at 202:25–203:1 (emphasis added).)

    In spite of that portion of Kelly's testimony, which Plaintiff did not cite, Plaintiff stated
in his brief that "Mr. Kelly also read the Street Report but conveniently does not recall whether it
was before or after he made staffing decisions."  (Pl.'s Resp. Opp'n Mot. Summ. J. 6 (citing
Kelly Dep., 64:4–18).)  The portion of Kelly's deposition that Plaintiff cited reads as follows:
"Mr. Epstein: Q. You earlier said that you don't remember when it is that you read this report.
You read it at some point?  Mr. Schreiner: Objection to the form.  Mr. Epstein: Q. Do you know
whether or not you read this report before or after you made any staffing decisions?  Mr.
Schreiner: Objection to the form. Mr. Epstein: Q. You can say 'I don't know.'  Whatever your
answer is is perfectly okay.  Just answer.  A. I do not remember."  (Kelly Dep., 64:4–18.)

    That exchange was preceded by the following one, which Plaintiff did not reference:
"Mr. Epstein: Q. In connection with [staffing decisions] had you read this report when you made
those decisions?  A. **No.** Q. You're sure of that? A. Yes. Mr. Schreiner: Objection to the form,
asked and answered.  Mr. Epstein: Q. How are you sure of that?  If you don't know when it is
that you read the report— Mr. Schreiner: **I don't think he's ever testified that he read the
report, first of all**.  I'm objecting to the question, to the form of the question."  (Id. at 63:7–23
(emphasis added).)

    The Court cautions Plaintiff's counsel against future mischaracterization of a deponent's
testimony.

Defendant and its Board would initiate an independent investigation into the sexual harassment allegations against Greene, but Street never spoke to Plaintiff in connection with any such investigation.  (Am. Compl. ¶ 32; Pl.'s Resp. Opp'n Mot. Summ. J. Ex. 6, Deposition of John F. Street ("Street Dep."), 53:13–19, June 11, 2014.)

In December 2010, Defendant hired Kelly as its Interim Executive Director.  (Def.'s Mem. Supp. Mot. Summ. J. 4, Ex. D, Deposition of Michael Kelly ("Kelly Dep."), 11:16–23, 25:7–13, May 22, 2014.)  On January 28, 2011, Kelly appointed Audrey Lim ("Lim") as Defendant's acting director of human resources.  (Id. at 69:24–70:3.)  Kelly appointed Lim as acting director because he was in the process of assessing Defendant's human resources department with a consultant, Paulette Campbell ("Campbell").  (Id. at 41:3–14.)  Kelly wanted Lim to serve in an acting capacity while working under Campbell so that she could assist in reorganizing the human resources department and in recruiting a full-time human resources director.  (Id.)  Kelly appointed Lim to serve as the acting human resources director until, based on discussions with Campbell, a permanent director could be hired.  (Id. at 67:24–68:11.)  Kelly did not ask Plaintiff to take on the role of acting human resources director because Plaintiff was the general counsel for labor and Kelly viewed Plaintiff's role "as being one of legal."  (Id. at 42:19–43:1.)  Plaintiff never held the title of director of human resources while employed by Defendant.  (Pasour Dep. 134:16–22; 135:7–9.)  Plaintiff testified at his deposition that, prior to January 2011, he "acted sort of in an HR/head of HR capacity" because he "did the functions other than payroll and recruitment that an HR Department normally does."  (Id. at 134:23–135:6.)  Plaintiff testified at his deposition that Kelly advised him that he needed "cover," which indicated to Plaintiff that "the Board members wanted Plaintiff gone because of the Street Report."  (Pl.'s Resp. Opp'n Mot. Summ. J. 6; Pasour Dep. 27:1–17.)  According to Plaintiff's

deposition testimony, Kelly had advised Plaintiff in December 2010 that "the Board members thought he was some sort of 'rogue agent off doing [his] own thing because of the Carl Greene issues and that he needed . . . cover.'" (Id. (quoting Pasour Dep. 28:19–29:8).)

When Kelly joined Defendant in December 2010, Defendant had an internal board known as the Administrative Board, which was an internal committee that reviewed issues regarding personnel matters. (Def.'s Mem. Supp. Mot. Summ. J. 5; Pasour Dep. 19:14–17.) In January 2011, the Administrative Board had three voting members who were all PHA executives: Diane Rosenthal ("Rosenthal"), Carolyn Carter ("Carter"), and Linda Staley ("Staley"). (Id. at 23:21–24.) Although Plaintiff was not a voting member of the Administrative Board, he served as an advisor, attended meetings, gave advice regarding personnel matters and policies, and drafted meeting minutes. (Id. at 19:11–13, 19:18–20:6.) Plaintiff did not attend pre-board meetings or executive sessions and did not have the authority to present issues to the Board. (Pl.'s Resp. Opp'n Mot. Summ. J. Ex. 1, Affidavit of Frederick K. Pasour ("Pasour Aff.") ¶ 8, Sept. 15, 2014.)

On January 28, 2011, the Administrative Board met to vote on two proposed resolutions. (Pasour Dep. 23:15–20, 34:16–22.) Plaintiff was invited to the meeting and briefly attended it[3] to hand out documents, and left. (Id. at 24:24–25:20.) Notably, Plaintiff did not vote on the resolutions. (Id. at 230:1–14.) The first resolution dealt with Defendant's universal leave policy, while the second resolution allowed certain of Defendant's employees to elect to either

---

[3] Plaintiff states that he "was not even present at the January 28, 2011 meeting" but also states that "[he] made a brief appearance at the meeting." (Pl.'s Resp. Opp'n Mot. Summ. J. 12.) These conflicting statements in Plaintiff's brief are not explained. According to the Kroll Report, Plaintiff stated that he was absent from the meeting because "he went for a walk (because he was upset over something that had occurred that he did not wish to reveal) and did not appear for the meeting," and "confirmed that he stopped by to drop off the resolutions and indicated that he could not stay for the meeting." (Kroll Report at 11 n.7.)

contribute certain accrued vacation time to their pension plan or to take a one-time, lump-sum, cash payout of the accrued vacation time (the "Vacation Accrual Resolution").  (Id. at 37:2–18, 39:2–45:13.)  Defendant's pension board counsel, John Nixon, drafted the Vacation Accrual Resolution pursuant to Rosenthal's direction.[4]  (Id. at 41:13–45:25.)  The Vacation Accrual Resolution was intended to clarify aspects of Defendant's existing vacation accrual policy.  (Id. at 141:17–142:24.)  The Vacation Accrual Resolution financially benefitted Plaintiff and two of the voting members of the Administrative Board.[5]  (Def.'s Mem. Supp. Mot. Summ. J. 6, Ex. D, Deposition of Nicholas C. Harbist, Esq. ("Harbist Dep."), Ex. 3, June 13, 2014.)  Plaintiff was aware that if the Administrative Board passed the Vacation Accrual Resolution, there was a potential for him to receive a monetary benefit.  (Pasour Dep. 51:2–11.)  The Administrative Board adopted both resolutions at the January 28, 2011 meeting.  (Harbist Dep. 13:18–22.)

Kelly, who was by that time the Interim Executive Director for Defendant, was not aware that the Administrative Board was meeting on January 28, 2011, nor was he aware of the actions it was taking.[6]  (Kelly Dep. 76:6–11.)  Plaintiff testified at his deposition that he advised Shelly James, the Assistant Executive Director, about the meeting and that she should have told Kelly

---

[4] Defendant still works with Mr. Nixon's law firm.  (Pl.'s Resp. Opp'n Mot. Summ. J. 12; Kelly Dep. 114:9–117:7.)

[5] Plaintiff states that he was not a benefits attorney and asserts that he did not have the responsibility of advising Administrative Board members regarding the Pennsylvania Sunshine Act.  (Pl.'s Resp. Opp'n Mot. Summ. J. 12; Pasour Dep. 45:14–18, 105:4–23.)

[6] According to Kelly, as stated in the Kroll Report, discussed below, he was not aware that the Administrative Board even existed until January 31, 2011, when other PHA employees brought the Administrative Board's actions, also discussed below, to his attention.  (Def.'s Mem. Supp. Mot. Summ. J., Ex. E, Affidavit of Nicholas Harbist, Ex. 1, Kroll Report, Mar. 1, 2011, at 13.)

about the meeting.[7]  (Pl.'s Resp. Opp'n Mot. Summ. J. 12; Pasour Dep. 72:1–18.)  Kelly learned

of the meeting and the resulting changes to personnel policies affecting the Administrative Board

members' benefit packages the following week, and after learning that information, requested an

outside investigation to determine whether any improper conduct had occurred.  (Kelly Dep.

75:20–76:15, 82:11–84:4, 90:12–14, 91:14–20, 92:25–93:15.)  On February 4, 2011, Kelly met

separately with Plaintiff and each of the three voting members of the Administrative Board to

advise them of his decision to place them on administrative leave with pay.  (Id. at 92:18–93:4,

94:11–20, 101:7–10, 108:12–19.)  During Kelly's meeting with Plaintiff, Kelly advised him that

he was being placed on administrative leave with pay based on his involvement with the

Administrative Board and the actions it took on January 28, 2011.  (Id. at 108:20–109:12; Pasour

Dep. 76:15–25.)  Kelly sent Plaintiff a letter confirming their discussion.  (Kelly Dep. 117:22–

118:17; Pasour Dep. 79:22–80:3.)  Descriptions for job postings in Defendant's legal department

were being drafted as early as February 17, 2011, and Plaintiff saw an advertisement for his job

position on Monster.com in February 2011.  (Pasour Dep. 152:20–153:17, Ex. 4; Pl.'s Resp.

Opp'n Summ. J. 7–8, Ex. 15, Email Chain between Audrey Lim and Paulette Campbell

regarding job postings (filed under seal).)  In a February 17, 2011 email regarding a particular

posting, Ms. Lim expressed concern about the required years of experience listed for that

position relative to what would be listed for "Genera [sic] Counsel position."  (Pl.'s Resp. Opp'n

Summ. J. 7–8, Ex. 15 (filed under seal).)

    On February 6, 2011, the Philadelphia Inquirer ran an article titled "PHA Suspends Four

Top Employees."  (Pl.'s Resp. Opp'n Summ. J. 8, Ex. 16.)  The article referred to the suspended

employees as being in Greene's inner circle and reported that Street had identified Plaintiff as

---

[7] According to the Kroll Report, "James recalled that [Plaintiff] only told him about the meeting later in the day, when James called [Plaintiff] and asked why he did not make the meeting that James had requested he attend."  (Kroll Report at 11 n.7.)

one of the people who allegedly helped Greene conceal the settlements related to three sexual harassment complaints.  (Id.)  The article did not report that Plaintiff had been suspended in connection with his involvement with the Administrative Board.  (Id.)  Mr. Kelly did not contact the article's authors to clarify the reason behind Plaintiff's suspension.  (Pl.'s Resp. Opp'n Mot. Summ. J. 8; Kelly Dep. 179:11–181:2.)

Either in late January or early February 2011, Defendant retained the law firm of Blank Rome LLP ("Blank Rome") to conduct an investigation of the Administrative Board's actions. (Harbist Dep. 7:8–8:7.)  Blank Rome in turn retained Kroll Associates ("Kroll") to assist in the investigation.  (Id. at 13:6–14:6.)  Kroll prepared a report for Blank Rome dated March 1, 2011 ("Kroll Report"), which set forth its factual findings concerning the Administrative Board's actions.[8]  (Def.'s Mem. Supp. Mot. Summ. J. 8, Ex. E, Affidavit of Nicholas C. Harbist, Esq. ("Harbist Aff.").)  Blank Rome submitted a report to Defendant dated March 8, 2011 ("Blank Rome Report") which included a copy of the Kroll Report.  (Id.)  In April 2011, Defendant's employees intended to have discussions about how to handle the employment status of what Kelly referred to in an email as the "Gang of Four."  (Pl.'s Resp. Opp'n Mot. Summ. J., Ex. 17, Email chain between Annie Cheng, Michael Kelly, and Estelle Richman.)

On March 16, 2011, Defendant sent Plaintiff a letter advising him of the investigation as well as Defendant's preliminary finding that Plaintiff should be separated from his employment. (Def.'s Mem. Supp. Mot. Summ. J. 9.)  The letter invited Plaintiff and his personal counsel to meet with Defendant on March 25, 2011 to discuss Defendant's findings and gather any

---

[8] With regard to Plaintiff, the Kroll Report noted, among other events, the following:  In March 2010, Plaintiff spoke with outside benefits counsel regarding the need for a draft resolution to allow employees enrolled in both pension plans to take the cash value of excess leave either as taxable compensation or as an added contribution to their deferred compensation account; a similar conversation Plaintiff had with outside counsel at a Pension Board meeting in December 2010; and conflicting reasons given by Plaintiff and other individuals for Plaintiff's absence from the January 28, 2011 Administrative Board meeting.  (Kroll Report at 8, 9, 11 n.7.)

additional information Plaintiff wanted Defendant to consider, and also informed Plaintiff that he

would remain on paid leave for the time being.  (Pasour Dep. 91:12–21; Pasour Dep. Ex. 8.)

Upon Plaintiff's counsel's request that the meeting be postponed, Defendant advised Plaintiff, in

a May 18, 2011 letter, that the meeting would be rescheduled for May 20, 2013.  (Id. at 95:15–

25, Ex. 9.)  In that letter Defendant also advised Plaintiff that it had "lost confidence in

[Plaintiff's] ability to advise PHA as an attorney" and listed specific items that "caused PHA to

call [Plaintiff's] judgment into question," including the following:

> 1) In connection with the January 28, 2011 Administrative Board meeting, you acted under a conflict of interest by participating in drafting the Vacation Accrual Resolution which would financially benefit you.
>
> 2) In connection with the January 28, 2011 Administrative Board meeting, although you purported to be a legal advisor to the Administrative Board, you failed to notify the Board members that they were operating under a conflict of interest when they passed the Vacation Accrual Resolution which would financially benefit them.
>
> 3) In connection with the January 28, 2011 Administrative Board meeting, although you purported to be a legal advisor to the Administrative Board, you failed to advise the Board members that the Board's actions were subject to Pennsylvania's Sunshine Act (65 Pa. C.S.A. § 701 et seq.).
>
> 4) In connection with the January 28, 2011 Administrative Board meeting, as PHA's attorney and an attorney providing advice to the Administrative Board, you failed to notify Michael Kelly, the Interim Executive Director, of the meeting on January 28 or the Administrative Board's proposed actions despite Mr. Kelly's membership in the Administrative Board by virtue of his position at PHA, as well as past practices within PHA.

(Id. at Ex. 9.)

On May 20, 2011, Plaintiff and his counsel met with Defendant's representatives and its

counsel at Defendant's office.  (Pasour Dep. 117:2–8, 118:10–25.)  At the meeting, Plaintiff was

given the opportunity to provide Defendant with any additional information he wished Defendant

to consider.  (<u>Id.</u> at 120:11–17.)  On May 27, 2011, Defendant sent a letter to Plaintiff advising

him that his employment was terminated effective May 27, 2011.  (<u>Id.</u> at 122:3–123:10, Ex. 10.)

In the letter, Defendant outlined the basis for Plaintiff's termination:

> On May 18, 2011, PHA sent you a letter outlining the issues that
> have caused PHA to call your judgment into question, including, in
> connection with the January 28, 2011 Administrative Board
> meeting; acting under a conflict of interest by participating in
> drafting a resolution which would financially benefit you; failing
> to notify the Board members that they were operating under a
> conflict of interest when they passed a resolution which would
> financially benefit them; failing to advise the Board members that
> the Board's actions were subject to the Pennsylvania Sunshine Act;
> and failing to notify the Interim Executive Director of the meeting
> on January 28 or the Administrative Board's proposed actions.

(Pasour Dep. Ex. 10.)

Kelly testified at his deposition that he made the decision to terminate Plaintiff's

employment, and that he did so based on "[Plaintiff's] involvement in the administrative board,

nothing more."  (Kelly Dep. 146:19–22; 154:4–23.)  In making his decision, Kelly relied on the

Kroll and Blank Rome Reports.  (<u>Id.</u> at 154:25–155:16.)  At his deposition, Kelly was asked

whether he told any reporters that Plaintiff's actions concerning Greene, as discussed in the

Street Report, had nothing to do with Plaintiff's termination, to which he responded, "I may have

because it didn't have anything to do with it."  (<u>Id.</u> at 192:15–24.)

Defendant's employment of Rosenthal, Carter, and Staley also ended as a result of their

involvement with the Administrative Board meeting on January 28, 2011.  (Def.'s Mem. Supp.

Mot. Summ. J. 11.)  They never returned from administrative leave and negotiated agreements

with Defendant that resolved issues related to their employment with Defendant and which

allowed them to retire.  (Kelly Dep. 143:8–144:21.)  Defendant also engaged in discussions with

Plaintiff prior to his termination as part of an effort to "amicably end his employment," but the parties were unable to reach an agreement.  (Id. at 143:8–144:21, 149:10–22, Ex. 15; Def.'s Mem. Supp. Mot. Summ. J. 12.)

An article entitled "PHA Lawyer Terminated, Three Other Staffers Leave" appeared on Philly.com on June 23, 2011.  (Pl.'s Resp. Opp'n Mot. Summ. J. 9, Ex. 21.)  The article identified Plaintiff as the employee whose employment was terminated and quoted the letter from Kelly to Plaintiff that explained the reasons for Plaintiff's termination and which stated that Defendant had "lost confidence in [Plaintiff's] ability to advise PHA as an attorney."  (Id.)  Kelly testified at his deposition that he spoke with one of the article's authors to confirm Plaintiff's termination.  (Id.)  The article referenced the fact that Plaintiff had worked on sexual harassment complaints against Greene and that Plaintiff had been criticized in an internal investigation into Greene's conduct, but did not state that Plaintiff's termination was connected to matters involving the Administrative Board.  (Id.)  Kelly testified at his deposition that he did not remember whether he advised the article's authors that Plaintiff's termination was not connected to the Street Report.  (Pl.'s Resp. Opp'n Mot. Summ. J. 9; Kelly Dep. 129:15–193:2.)

Plaintiff, through his attorneys, requested several times, both orally and in writing, that he be given a public due process hearing to "clear his name."  (Pl.'s Resp. Opp'n Mot. Summ. J. 9, Ex. 7, Plaintiff's Responses to Defendant's Interrogatories, No. 3; Am. Compl. ¶ 41.)  Plaintiff made these requests in April, May, and September 2011.  (Id.)  A "public name-clearing hearing" did not occur.  (Id.)  On May 20, 2011, Plaintiff attended a private meeting with Lim, Defendant's acting general counsel, Defendant's outside counsel, and Plaintiff's attorney.  (Id.; Pasour Dep. 118:10–121:3.)  At that meeting, no members of the public or press were present, and there was no court reporter.  (Id. at 10–11; Harbist Dep. 57:1–14.)

11

Plaintiff has been unable to obtain permanent employment as an attorney since Defendant terminated his employment.  (Pasour Dep. 170:10–171:7.)  Plaintiff has been told by prospective and former employers that they could not employ him "because of the political volatility attached to him," that he "was radioactive and could not be placed at [a particular] firm," and that his "presence would bring unwanted attention."  (Pl.'s Resp. Opp'n Mot. Summ. J. 13; Pasour Dep. 179:1–22, 181:13–183:6, 13:14–15:19.)

After satisfying the requisite procedural requirements, Plaintiff filed a complaint in the Court of Common Pleas for Philadelphia County on March 28, 2013, asserting claims for liberty interest, defamation, and invasion of privacy/false light.  Defendant removed the complaint to federal court on April 26, 2013 and moved to dismiss it.  Plaintiff filed an Amended Complaint on May 20, 2013, which Defendant moved to dismiss on May 29, 2013.  The Motion to Dismiss was granted in part and denied in part on August 7, 2013, allowing Plaintiff to proceed with his deprivation of liberty interest in reputation claim.  Defendant filed its Motion for Summary Judgment on July 13, 2014.  Plaintiff filed a response on September 15, 2014.  Defendant filed its reply on September 23, 2014.  The Court heard the arguments of the parties on December 3, 2014.  As the briefing process has been exhausted, Defendant's Motion for Summary Judgment is now ripe for judicial consideration.

## II.     STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at 325.  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue.  Anderson, 477 U.S. at 249–50.

### III.    DISCUSSION

Plaintiff claims he was deprived of a liberty interest in reputation without due process in violation of 42 U.S.C. § 1983.  Specifically, Plaintiff alleges that the former Chairman of Defendant's Board of Commissioners, John Street, falsely accused him of engaging in an unlawful conspiracy to conceal sexual harassment charges against Defendant's former Executive Director, Carl Greene.  Plaintiff goes on to assert that Street's statements were made public and disseminated in the news, after which Plaintiff was demoted, suspended, and ultimately terminated, and which have left him unable to obtain continuing employment in the legal profession.  After careful consideration, the Court finds that Defendant has not eliminated all genuine issues of material fact, and therefore summary judgment for Defendant, with respect to the remaining claim asserted in the Amended Complaint, would not be appropriate.

### A.    <u>Deprivation of Liberty Interest</u>

The Supreme Court has held that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."  <u>Wisconsin v. Constantineau</u>, 400 U.S. 433, 437 (1971).  When notice and an opportunity to be heard are not provided, a plaintiff may bring "a due process claim for deprivation of a liberty interest in reputation."  <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 236 (3d Cir. 2006) (citation omitted).  To prevail, the plaintiff must demonstrate "a stigma to his reputation <u>plus</u> deprivation of some additional right or interest."  <u>Id.</u> (emphasis in original) (citing <u>Paul v. Davis</u>, 424 U.S. 693, 701 (1976)).  This is referred to as the "stigma-plus" test, and in the context of public employment, it "has been applied to mean that when an employer 'creates and disseminates a false and defamatory impression about the employee in connection

14

with his termination,' it deprives the employee of a protected liberty interest." Id. (quoting Codd v. Velger, 429 U.S. 624, 628 (1977)).

"To satisfy the 'stigma' prong of the test, it must be alleged that the purportedly stigmatizing statement(s): (1) were made publicly; and (2) were false." Hill, 455 F.3d at 236 (internal citations omitted). "To satisfy the 'plus' requirement, a plaintiff must demonstrate that the alleged defamation harming plaintiff's reputation 'occurs in the course of or is accompanied by extinguishment of a right or status guaranteed by law or the Constitution.'" Mun. Revenue Servs., Inc. v. McBlain, No. Civ.A.06-4749, 2007 WL 879004, at *4–5 (E.D. Pa. Mar. 19, 2007) (quoting Hill, 455 F.3d at 235), aff'd, 347 F. App'x 817 (3d Cir. 2009). "The creation and dissemination of a false and defamatory impression is the 'stigma,' and the termination is the 'plus.' When such a deprivation occurs, the employee is entitled to a name-clearing hearing." Hill, 455 F.3d at 236. The Third Circuit has held that "a public employee who is defamed in the course of being terminated or constructively discharged satisfies the 'stigma-plus' test even if, as a matter of state law, he lacks a property interest in the job he lost." Id. at 238.

Plaintiff argues that he "was deprived of his interest in his reputation and his ability to earn a living in his chosen profession as an attorney as a result of the statements falsely accusing him of unethical professional conduct which were broadly disseminated by the Defendant," and that he "was thereafter demoted, suspended and terminated under circumstances leading to the false impression that these actions were a result of the false allegations made in the Street Report and was not provided with a public hearing to clear his name with respect to this false impression." (Pl.'s Resp. Opp'n Mot. Summ. J. 16.) Defendant argues that Plaintiff cannot satisfy the requirements of the "stigma plus" test because: 1) Defendant's hiring of Lim as acting director of human resources and Defendant's placement of Plaintiff on paid leave are not, as a

15

matter of law, deprivations of a legal right that support a due process claim; 2) Street's alleged statements in September 2010 were not made in connection with Lim's appointment on January 28, 2011, Plaintiff's placement on administrative leave on February 4, 2011, or the termination of Plaintiff's employment on May 27, 2011; and 3) the news articles published February 6, 2011 and June 23, 2011 cannot support Plaintiff's liberty interest claim because they do not contain stigmatizing statements that were made publicly by Defendant.  (Def.'s Mem. Supp. Mot. Summ. J. 19.)  The Court will first consider which of the alleged deprivations could support Plaintiff's "stigma-plus" claim and then determine which of the statements Plaintiff identifies as stigmatizing were made in connection with those deprivations.

### 1.  Deprivation of a Liberty Interest in a Right or Status

As a preliminary matter, the Court must determine whether Defendant deprived Plaintiff of a constitutionally protected right or interest through demotion, suspension, lost career prospects, and termination.  First, Defendant argues that Plaintiff was not demoted when Lim was appointed acting director of human resources because, while Plaintiff testified at his deposition that he performed certain duties that would typically be performed by a human resources department employee, his actual position was general counsel for labor and employment and he never held the title of human resources director.  Plaintiff responds by relying on his deposition testimony and arguing that he "was replaced in his responsibilities as the Head of Human Resources by Audrey Lim, who was not qualified to handle this position" and that he was "remove[d] . . . as the Head of Human Resources."  (Pl.'s Resp. Opp'n Mot. Summ. J. 23.)  As Plaintiff himself testified, he never held the title of human resources director, and therefore he cannot have been "removed" or "demoted" from that position.[9]  Even if Plaintiff

---

[9] Plaintiff testified at his deposition that, when Kelly told him Lim would become his supervisor, Plaintiff was also told that his salary would be reduced by approximately $10,000 and that his

had previously undertaken responsibilities related to human resources in addition to his responsibilities as general counsel for labor and employment, Defendant's hiring of Lim to handle those responsibilities did not deprive Plaintiff of any legal right to them.  Accordingly, Plaintiff's liberty interest claim cannot be supported by Defendant's appointment of Lim.

Second, Defendant argues that as a matter of law, Defendant's placement of Plaintiff on administrative leave with pay does not constitute a deprivation of a right or interest sufficient to support a liberty interest claim.  Plaintiff responds by arguing that even though Defendant characterizes his suspension as "administrative leave," Defendant intended that he be precluded from being on PHA premises, denied access to PHA apparatuses, and prevented from communicating with current PHA staff, and also began drafting descriptions for Plaintiff's job in order to seek applicants for his position.  (Pl.'s Resp. Opp'n Mot. Summ. J. 23.)  Thus, according to Plaintiff, his "purported suspension was more akin to a termination."  (Id.)  The suspension, however, was not a termination, and Defendant correctly points out that, within the Third Circuit, suspension with pay does not constitute a deprivation of rights sufficient to support a claim for deprivation of liberty interest in reputation without due process.  See Edwards v. Cal. Univ. of Pa., 156 F.3d 488, 492 (3d. Cir. 1998) ("While [the plaintiff's] temporary removal from [job] duties may have further stigmatized him, this action does not constitute a deprivation of employment.").  Accordingly, Plaintiff's suspension with pay cannot support a claim for deprivation of liberty interest in reputation.

---

title would be changing.  (Pasour Dep. 26:16–21.)  Plaintiff argued in his counterstatement of material facts that this was a "demotion" (Pl.'s Resp. Opp'n Mot. Summ. J. 6), but also testified at his deposition that his last position at PHA, at the time his employment was terminated, was still "general counsel for labor and employment."  (Pasour Dep. 10:22–27:2.)  Any pay cut which occurred around the same time as Defendant's appointment of Lim, in the absence of any other evidence aside from Plaintiff's deposition testimony, appears to be a reduction in salary rather than a "demotion."  As Defendant's Motion for Summary Judgment is being denied, however, Plaintiff may choose to argue at trial that the purported reduction in salary constituted a constitutional deprivation.

Third, to the extent that Plaintiff alleges a deprivation because he has been unable to find employment in the legal profession, either because of the Street Report or because of statements which appeared in newspaper and online news articles, those allegations go to the "stigma" element of his claim, rather than the deprivation, or "plus" element.  See Arneault v. O'Toole, 513 F. App'x 195, 198–99 (3d Cir. 2013) (stating that to the extent a plaintiff alleged that he lost possible career prospects, that is "part of the stigma alleged and not an additional lost interest or right.").  Lost career prospects are not "purportedly stigmatizing statements" by an employer, and accordingly, any difficulty Plaintiff has had in finding employment in the legal profession since Defendant terminated his employment does not by itself support Plaintiff's deprivation of liberty interest claim.  Plaintiff cites district court cases[10] where "the 'plus' element can be satisfied by the foreclosure of future opportunities and the inability to find future employment" (Pl.'s Resp. Opp'n Mot. Summ. J. 26), but in light of the Third Circuit's opinion in Arneault, those cases do not control that issue.

As neither Lim's appointment as acting director of human resources, Plaintiff's placement on paid leave, nor lost future career prospects, can provide the "plus" for a claim for

---

[10] Unfortunately, the Court must again caution Plaintiff's counsel, this time against mischaracterizing case law.  Plaintiff cites Arneault v. O'Toole, 864 F. Supp. 2d 361 (W.D. Pa. 2012), aff'd on other grounds, for the proposition that negative implications for employment prospects establishes a "plus" for the "stigma-plus" test, without mentioning the Third Circuit's opinion in the same case, discussed above, which states that lost career prospects are part of the "stigma" rather than the "plus."  See Arneault, 513 F. App'x at 198–99.

While not including the Third Circuit case in his brief is itself problematic, Plaintiff's mischaracterization of the district court opinion in Arneault is more troubling.  Plaintiff's brief states that "[r]ecognizing that **there may be doubts** whether the plaintiff adequately 'pled an alteration of his legal status,' the court **determined** that he nevertheless '. . . alleged sufficient facts to establish the necessary 'plus.'"  (Pl.'s Resp. Opp'n Mot. Summ. J. 22 (emphasis added) (citing Arneault, 864 F. Supp. 2d at 398).)  What the district court actually stated was **"[w]e therefore have some doubts** as to whether Arneault [. . .] has successfully pled an alteration of his legal status. . . .   Nonetheless, **this Court will proceed on the assumption, without deciding**, that Arneault has alleged sufficient facts to establish the necessary "plus."  Arneault, 864 F. Supp. 2d at 398.

deprivation of liberty interest in reputation, the Court will analyze Plaintiff's claim using the "stigma-plus" test only with respect to Defendant's termination of his employment.

### 2.   The "Stigmatizing" Statements

Plaintiff alleges three stigmatizing statements were made in connection with his termination, thus depriving him of his liberty interest in reputation: 1) statements in the Street Report; 2) statements in a February 6, 2011 article that appeared in the Philadelphia Inquirer; and 3) statements in a June 23, 2011 article which appeared on Philly.com.

With respect to the statements attributed to the Street Report, Defendant argues that Plaintiff cannot establish a liberty interest claim because those statements "were made well before the alleged deprivation of the plaintiff's rights" and because "the subject matter of the statements on which [the] claim is based is unrelated to the reasons for the alleged deprivation of rights." (Def.'s Mem. Supp. Mot. Summ. J. 20–21.)  The Court will first address the issue of timing.

To rise above the level of the tort of defamation to the level of a violation of a constitutionally protected liberty interest, any allegedly defamatory statements in the Street Report must have been made "incident to the termination" of Plaintiff's employment.  Siegert v. Gilley, 500 U.S. 226, 234 (1991).  The Third Circuit has stated that "[i]n order to be considered 'in connection with' a termination, an allegedly defamatory statement and the firing must be at least roughly contemporaneous."  Orelski v. Bowers, 303 F. App'x 93, 94 (3d Cir. 2008) (finding that two and a half months was "a long delay [which] eviscerates any temporal nexus between the statements and the termination.") (citations omitted).  More generally, in the civil rights context, the Third Circuit Court of Appeals has suggested that a temporal proximity of two days is sufficient to establish causation, see Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279–80

& n.5 (3d Cir. 2000), whereas a temporal proximity of ten days is sufficient to establish

causation only when accompanied by other evidence of wrongdoing.  Shellenberger v. Summit

Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003).  In the absence of that proof, the plaintiff must

show that, from the "evidence gleaned from the record as a whole," the trier of the fact should

infer causation.  Farrell, 206 F.3d at 281.

Here, the statements in the Street Report, assuming they were defamatory, were publicly

disseminated approximately eight months before Defendant terminated Plaintiff's employment,

and approximately four months before the events on which Plaintiff's suspension and

termination were based occurred.  Generally speaking, a gap of four months to eight months

between the stigmatizing statements and the deprivation would be too long for the statements to

have been made "incident to" Plaintiff's termination.  In this case, however, Plaintiff has alleged

that there was a "continuing course of conduct by the Defendant leading to [Plaintiff's]

termination[,] [which] demonstrate[s] that the actions taken against [Plaintiff] were directly

related to the Street Report."[11]  (Pl.'s Resp. Opp'n Mot. Summ. J. 27.)  Plaintiff has set forth

some evidence, in addition to his own deposition testimony, on which a jury could find a

continuing course of conduct that satisfies the "stigma-plus" test.  Specifically, Plaintiff relies on

job postings and emails between Defendant's employees which could indicate that Defendant

was already searching for Plaintiff's replacement shortly after suspending him and before the

Kroll and Blank Rome investigations into the Administrative Board meeting had even

concluded.  Plaintiff also points to Kelly's email, in which Kelly refers to Plaintiff as part of a

"Gang of Four," in support of his argument that he was stigmatized by the Street Report, that its

---

[11] This Court stated previously, at the motion to dismiss phase when Plaintiff's allegations were
taken as true, that Plaintiff's argument regarding a "continuing course of conduct connecting the
termination to the damaging statements made by Chairman Street" could lead a jury to conclude
that his 'eventual termination was the direct result of Chairman Street's statements.'"  Pasour v.
Phila. Hous. Auth., No. Civ.A.13-2258, 2013 WL 4014514, at *5 (E.D. Pa. Aug. 7, 2013).

content was connected to the decision to terminate his employment, that Kelly must have read the Street Report,[12] and that it contributed to his decision to terminate Plaintiff's employment. Although Plaintiff relies heavily on his own deposition testimony, he has also set forth some documentary evidence to support his argument. By contrast, Defendant has not set forth evidence that would preclude an inference of causation sufficient for a jury to find in Plaintiff's favor. See Farrell, 206 F.3d at 281. Accordingly, it would not be appropriate to grant summary judgment to Defendant based solely on the amount of time that elapsed between the publication of the Street Report and Plaintiff's suspension and ultimate termination.

In response to Defendant's subject matter argument relating to the Street Report, Plaintiff argues that it does not matter that his termination was ostensibly for reasons unrelated to allegations about Plaintiff's conduct which appeared in the Street Report, relying on Povish v. Pennsylvania Department of Correction for the proposition that the "stigma-plus" test can be satisfied even where the conduct underlying the stigmatizing remarks is not the reason for the termination. (Pl.'s Resp. Opp'n Mot. Summ. J. 25–26 (citing Povish, No. Civ.A.13-0197, 2014 WL 1281226, at *5–6 (E.D. Pa. Mar. 28, 2014).) The court in that case stated that "[i]f an employer fires someone for a legitimate reason but announces to the public a false, defamatory reason, that person may still face lowered standing in the community and unwarranted difficulty in finding new employment," and therefore the "stigma-plus" standard could still be met. See Povish, 2014 WL 1281226 at *6. Plaintiff's situation is somewhat distinct because he argues that a false, defamatory reason for his eventual termination was announced via the Street Report prior to his actual termination, and prior to Defendant announcing a presumably legitimate reason for Plaintiff's termination. Nonetheless, Plaintiff will have the opportunity to demonstrate at trial that, for purposes of his "stigma-plus" claim, any defamatory statements in

---

[12] See supra note 2.

the Street Report trump the allegedly legitimate reason regarding the Administrative Board that Defendant announced to the public in connection with its termination of Plaintiff's employment.

Defendant argues that Plaintiff's arguments are unavailing because, in order for Plaintiff's pretext argument to work, a jury would have to believe that it fired three other employees so that it could also fire Plaintiff.  (Def.'s Reply 8–9.)  It could also be argued, however, that the events that necessitated terminating the employment of the three Administrative Board members presented a convenient means of terminating Plaintiff's employment in light of the statements about Plaintiff which appeared in the Street Report. Defendant's arguments are not unreasonable, but on summary judgment review, the Court must consider the evidence in the light most favorable to Plaintiff.  Accordingly, summary judgment for Defendant must be denied.

Plaintiff also alleges that Defendant made stigmatizing statements which appeared in the Philadelphia Inquirer on February 6, 2011,[13] and on Philly.com on June 23, 2011.  With respect to the Philadelphia Inquirer article, the only statement by Defendant in that article is from a PHA spokeswoman who confirmed that employees had been suspended, but did not identify the employees because "PHA values the privacy of [its] employees and will not be providing the names of these individuals."  (Pl.'s Resp. Opp'n Mot. Summ. J., Ex. 16, Philadelphia Inquirer Article, Feb. 6, 2011.)  All other statements in the article concerning Plaintiff are attributed to anonymous sources, including one source who noted that "Kelly had decided to keep paying [the suspended employees] because he was investigating their roles in the handling of certain matters and had not yet determined if they did anything wrong" and that the source "did not know the

---

[13] Plaintiff states that his claim "is not premised on the February 6, 2011 article.  Rather, the article is simply additional evidence of the false impression created by PHA."  (Pl.'s Resp. Opp'n Mot. Summ. J. 19.)  As Plaintiff has also stated that allegedly stigmatizing statements from the Street Report were "republished" in that article (id. at 18), however, the Court will briefly discuss this article in the context of Plaintiff's claim.

focus of that internal probe." (Id.) The article's references to Greene, the investigation into Greene, and any connection Plaintiff had to Greene are attributable to the article's author, not Defendant, and appear in the context of general background information about PHA and a summary of the various federal investigations into PHA. (Id.) These statements, assuming they were stigmatizing, were not made publicly by Defendant. Plaintiff argues that Kelly did not contact the reporters who wrote the articles "to clarify the nature of [Plaintiff's suspension] and did nothing to correct the false impression that his suspension was related to matters involving Mr. Greene." (Pl.'s Resp. Opp'n Mot. Summ. J. 19.) The fact that Defendant did not undertake to police the phrasing and content of the Inquirer's newspaper articles, however, does not mean that Defendant publicly made stigmatizing statements in connection with Plaintiff's termination. Accordingly, statements in the Inquirer article cannot support Plaintiff's liberty interest claim against Defendant.

As discussed above, the statements concerning Greene and the Street Report which appeared in the Philly.com article were not made by Defendant, even though Plaintiff argues that they should be "attributed" to Defendant. (Id.) Moreover, the statements which can be attributed to Kelly's letter to Plaintiff, specifically that Plaintiff had been terminated because Defendant "lost confidence in [Plaintiff's] ability to advise PHA as an attorney," and which alluded to "a conflict-of-interest matter that would have been financially beneficial to [Plaintiff]," (Pl.'s Resp. Opp'n Mot. Summ. J., Ex. 21, Philly.com Article June 23, 2011), "were not sufficiently stigmatizing to implicate a liberty interest." See Brown v. Montgomery Cnty., 470 F. App'x 87, 91 (3d Cir. 2012) (observing that the complained-of statements regarding "improper" behavior "did little, if anything, to add to the stigma that [the Plaintiff] brought upon himself with his behavior.") (citing Mercer v. Cedar Rapids, 308 F.3d 840, 845–46 (8th Cir. 2002) ("[N]o liberty

23

interest of constitutional significance is implicated when 'the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance.'") (additional citations omitted)).  Accordingly, the statements in the Philly.com article do not support Plaintiff's liberty interest claim against Defendant.

### 3. <u>Public Name-Clearing Hearing</u>

Plaintiff argues that he requested, but was denied, a public name-clearing hearing, and was therefore denied due process in connection with his termination.  (Pl.'s Resp. Opp'n Mot. Summ. J. 27–29.)  As Defendant's Motion for Summary Judgment is being denied, Plaintiff will have the opportunity at trial to demonstrate that the circumstances of his termination satisfy the "stigma-plus" test and that the private meetings between Plaintiff and Defendant which occurred prior to his termination did not provide sufficient due process.

## IV.    CONCLUSION

Having reviewed the briefs and pleadings and their exhibits, and having heard the arguments of counsel, the Court finds that Defendant has not shown an absence of genuine issues of material fact that would preclude a jury from reasonably finding in Plaintiff's favor. Accordingly, the Court shall deny Defendant's Motion for Summary Judgment.

An appropriate Order follows.